[No. 78888-0. En Banc.]
Argued May 31, 2007. Decided August 2, 2007.

THE STATE OF WASHINGTON, *Respondent*, v. LAWRENCE MICHAEL FOXHOVEN, *Petitioner*.

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY ESPINOZA SANDERSON, *Petitioner*.

*Susan F. Wilk* (of *Washington Appellate Project*) and *Christopher Gibson* (of *Nielsen, Broman & Koch, PLLC*), for petitioners.

*David S. McEachran, Prosecuting Attorney*, and *Hilary A. Thomas, Deputy*, for respondent.

¶1 ALEXANDER, C.J. — In 2004, petitioners Lawrence Michael Foxhoven and Anthony Sanderson were each found guilty of several counts of malicious mischief for etching graffiti on the windows of several businesses. The graffiti included three different "tags,"[1] two of which police concluded were used by petitioners. At their joint trial, the judge admitted evidence that each petitioner had used one of the tags on previous occasions. Petitioners claim that evidence was improperly admitted under Evidence Rule (ER) 404(b), which excludes evidence of prior bad acts when that evidence is used for the purpose of proving conformity with those actions on a different occasion. We conclude that

---

[1] A "tag" is a moniker or pseudonym used by a graffiti artist in his or her graffiti. It is placed on public or private property to identify the person responsible for the graffiti (the "tagger"). Verbatim Report of Proceedings (Mar. 18, 2004) at 14.

the evidence was admissible to prove modus operandi in order to corroborate or establish the identity of the persons responsible for the graffiti vandalism charged. We, therefore, affirm the convictions.

I

¶2 In October 2001, graffiti was etched with acid into the windows of a number of businesses in downtown Bellingham. The graffiti consisted of three different tags: "HYMN," "GRAVE," and "SERIES." Investigating officers determined that petitioner Sanderson is associated with the tag "HYMN" and petitioner Foxhoven with the tag "SERIES." Foxhoven, Sanderson, and a third person who was associated with the tag "GRAVE" were each charged in Whatcom County Superior Court with several counts of malicious mischief for the graffiti. The third person pleaded guilty to several counts of malicious mischief, but petitioners proceeded to a joint trial before a jury.

¶3 Before trial, Foxhoven and Sanderson each moved to exclude any evidence of prior bad acts under ER 404(b). Foxhoven specifically objected to the admission of (1) his criminal history of graffiti from California and (2) photographs seized from Foxhoven's home that depicted graffiti involving the "SERIES" tag. CP-F[2] at 75. Sanderson objected to the admission of (1) his prior arrests for graffiti, (2) drawings of the "HYMN" tag seized from his home, (3) photos of him painting the "HYMN" tag, and (4) photos of graffiti involving the "HYMN" tag that were seized from his home. CP-S at 119, 123-24, 135-36. The trial judge denied the petitioners' motions, ruling, "Other acts of graffiti vandalism may be admitted to show a 'common scheme or plan' or to establish a particular 'modus operandi.'" CP-F at 98; CP-S at 56. In his order, the judge made the following findings of fact:

---

[2] Each petitioner has designated a set of clerk's papers in these consolidated cases. We refer to the clerk's papers designated by Foxhoven as "CP-F" and to those designated by Sanderson as "CP-S."

1. . . . The State alleges that each vandal had adopted a distinctive tag (pseudonym) and vandalized property with that unique tag again and again for years until it had become their vandalism identity. The State alleges that part of the over-arching scheme or plan of such vandals is to gain notoriety in the graffiti subculture by placing their adopted vandal names on the property of others. . . .

2. The "probative value" of evidence tending to show that each defendant is committed to a culture that explicitly encourages vandalism and that each defendant marks his crime with his unique signature is extremely high. In fact, such evidence is "necessary" for a fair determination of these cases.

3. There is no "unfair prejudice." The other acts for which evidence will be admitted are not marginally related or emotionally inflammatory. Instead, they are intimately related to the alleged motive for this crime (notoriety) and not emotionally inflammatory.

4. The probative value is not outweighed by the danger of unfair prejudice.

CP-F at 97-98; CP-S at 55-56.

¶4 The challenged evidence was admitted in trial, with the following limiting jury instruction:

Ladies and gentlemen of the jury, evidence has been introduced in this case previously and is being introduced at this time on the subject of the defendant's association with persons accused of graffiti vandalism or prior acts of graffiti vandalism for which they're not charged here today. This is being offered by the prosecution for the limited purposes of either modus operandi or common[ ] scheme plan or design. You're not to consider the evidence for any other purpose. I'll give you another instruction on that later on.

4 Verbatim Report of Proceedings (VRP) at 452.

¶5 Foxhoven was found guilty of 4 counts of first degree malicious mischief and 11 counts of second degree malicious mischief; Sanderson was found guilty of 2 counts of first degree malicious mischief and 5 counts of second degree malicious mischief. The judge subsequently dismissed one count against Foxhoven. He also reduced the degree of

three other counts against Foxhoven and one count against Sanderson. Both petitioners received sentences that were within the standard range and were ordered to pay restitution.

¶6 The petitioners appealed separately to Division One of the Court of Appeals, each claiming primarily that the evidence described above was improperly admitted under ER 404(b). The Court of Appeals consolidated their appeals and affirmed the trial court, concluding, "The trial court did not err by admitting the evidence that Foxhoven and Sanderson engaged in prior acts of graffiti under the modus operandi exception to ER 404(b) because the tags were signature-like and both defendants admitted they had used the same tags before." *State v. Foxhoven*, noted at 132 Wn. App. 1053, slip op. at 2 (2006). The Court of Appeals did not discuss whether or not the evidence was admissible to show common scheme or plan. Foxhoven and Sanderson sought review of the Court of Appeals' decision on various grounds, and we granted review on the ER 404(b) issue only.

## II

¶7 Interpretation of an evidentiary rule is a question of law, which we review de novo. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). When the trial court has correctly interpreted the rule, we review the trial court's decision to admit evidence under ER 404(b) for an abuse of discretion. *Id.*; *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). "Discretion is abused if it is exercised on untenable grounds or for untenable reasons." *Thang*, 145 Wn.2d at 642 (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). Failure to adhere to the requirements of an evidentiary rule can be considered an abuse of discretion. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001) (citing *State v. Rivers*, 129 Wn.2d 697, 706, 921 P.2d 495 (1996)).

¶8 ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the char-

acter of a person in order to show action in conformity therewith." This prohibition encompasses not only prior bad acts and unpopular behavior but *any* evidence offered to "show the character of a person to prove the person acted in conformity" with that character at the time of a crime. *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002). The State is incorrect when it asserts that the drawings of tags and most of the photographs fall outside the scope of ER 404(b) because they do not show criminal conduct or bad acts. In our judgment, all of the evidence at issue here is prohibited by ER 404(b) if offered to prove character.

 ¶9 ER 404(b) evidence, may, however, be admissible for another purpose, such as proof of motive, plan, or identity. ER 404(b) is not designed "to deprive the State of relevant evidence necessary to establish an essential element of its case," but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged. *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995). In this case, the challenged evidence was offered and admitted "to show a 'common scheme or plan' or to establish [identity via] a particular 'modus operandi.'" CP-F at 98; CP-S at 56.

 ¶10 Before admitting ER 404(b) evidence, a trial court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *Thang*, 145 Wn.2d at 642 (citing *Lough*, 125 Wn.2d at 853). This analysis must be conducted on the record. *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (citing *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984)). If the evidence is admitted, a limiting instruction must be given to the jury. *Lough*, 125 Wn.2d at 864. As noted above, such an instruction was given to the jury in this case.

■■ ¶11 Petitioners are challenging the third require-
ment: relevance. To be relevant, evidence must tend "to
make the existence of any fact that is of consequence to the
determination of the action more probable or less probable."
ER 401; *see also Smith*, 106 Wn.2d at 776 (quoting *State v.
Saltarelli*, 98 Wn.2d 358, 362-63, 655 P.2d 697 (1982)). The
trial court is generally the proper court to weigh the
relevance of evidence, and this court reviews such a deter-
mination for abuse of discretion. *Lough*, 125 Wn.2d at 861.

■■ ¶12 This court has previously held:

> When evidence of other bad acts is introduced to show
> identity by establishing a unique modus operandi, the evidence
> is relevant to the current charge "only if the method employed
> in the commission of both crimes is 'so unique' that proof that
> an accused committed one of the crimes creates a high prob-
> ability that he also committed the other crimes with which he
> is charged."

*Thang*, 145 Wn.2d at 643 (quoting *State v. Russell*, 125
Wn.2d 24, 66-67, 882 P.2d 747 (1994) (quoting *State v.
Hernandez*, 58 Wn. App. 793, 798-99, 794 P.2d 1327
(1990))). A prior act " 'is not admissible for this purpose
merely because it is similar, but only if it bears such a high
degree of similarity as to mark it as the handiwork of the
accused.' " *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668
(1984) (quoting *United States v. Goodwin*, 492 F.2d 1141,
1154 (5th Cir. 1974)); *see also Smith*, 106 Wn.2d at 777-78
(quoting *State v. Laureano*, 101 Wn.2d 745, 765, 682 P.2d
889 (1984)). The modus operandi " 'must be so unusual and
distinctive as to be like a signature.' " *Coe*, 101 Wn.2d at
777 (quoting EDWARD W. CLEARY, McCORMICK'S HANDBOOK OF
THE LAW OF EVIDENCE § 190, at 449 (2d ed. 1972)). The more
distinctive the defendant's prior acts, "the higher the prob-
ability that the defendant committed the crime, and thus
the greater the relevance." *Thang*, 145 Wn.2d at 643 (citing
*Coe*, 101 Wn.2d at 778). When there are few or no dissimi-
larities between prior acts and the crime charged, this adds
to the strength of the similarities. *Id.* at 644 (citing *State v.
Jenkins*, 53 Wn. App. 228, 237, 766 P.2d 499, *review denied*,

112 Wn.2d 1016 (1989)). "Whether the prior offenses are similar enough to the charged crime to warrant admission is left to the discretion of the trial court." *Jenkins*, 53 Wn. App. at 236 (citing *State v. Bowman*, 36 Wn. App. 798, 808-09, 678 P.2d 1273, *review denied*, 101 Wn.2d 1015 (1984)).

¶13 Petitioners argue that their prior tagging was too dissimilar from the vandalism in this case to constitute a modus operandi. Indeed, the evidence depicting prior tagging by petitioners involved different mediums on a wide variety of buildings, vehicles, and papers, and showed the use of various styles and fonts. Although some of the graffiti was very similar, virtually the only consistency throughout the tagging evidence was the use of the particular tags "HYMN" and "SERIES."

¶14 However, there is a great deal of evidence in this case showing that tags are not mere words; they are akin to signatures. Officer Don Almer, who investigates most of the graffiti in Bellingham, testified that the graffiti world is its own subculture, "a social network and framework that has its own norms, its own . . . societal kind of operations." 4 VRP at 402. Within that subculture, a tag is a person's identity. Officer Almer explained:

> Basically a tag is a fingerprint. . . . [A] graffiti vandal [is] not going to use [his or her] real name . . . just because of the negative connotation associated with tagging and the likelihood of facing arrest or imprisonment or incarceration, things like that.
>
> . . . [W]hat they do is come up with an identity, a moniker. What they do is they pick a word that . . . they like that has some specific meaning to them . . . . But they pick something that is their identity. They assume this identity.
>
> . . . .
>
> . . . And generally vandals, . . . they want to choose that name very carefully; because what they want to make sure is, A, nobody else has it in this area . . . and, B, it's something that they are going to enjoy writing or dealing with for many years, because that's their identity.

4 VRP at 409-10. Detective Rodney Hardin, a Seattle Police Department detective assigned to the graffiti unit, testified that, in his experience, taggers do not take on another's identity by stealing or "biting" their tag. 3 VRP at 307; *see* 3 VRP at 286. Officer Almer agreed and testified that petitioner Sanderson had told him, "You don't do that. People will throw down with you if that happens." 5 VRP at 595. Officer Almer went on to testify, "[Sanderson] said that in the graffiti culture, that's your name. You don't go out and write somebody else's name. The person's name or tag it is is basically going to get pissed, because it's their identity, their source of pride, things like that." *Id.*; *see also* 6 VRP at 791.

¶15 There was some evidence that taggers may occasionally draw others' tags. For example, beginning taggers sometimes practice writing others' tags or using others' styles, a tagger may put up or "hook[ ] up" the tag of a friend who cannot be present, 3 VRP at 287, a tagger may list others' tags in a "roll call," a graffiti list of active members of a group or "crew" who tag together, 3 VRP at 285; 4 VRP at 455, and taggers may practice others' styles in a practice book or "piece book," 3 VRP at 303, 304; 4 VRP at 452, 453; 6 VRP at 790. These uses of another's tag are generally distinguishable, though. Detective Hardin testified that a "hook[ ] up" would be in the same location as the tagger's own tag, not on a different building, as in the October 2001 graffiti. 3 VRP at 287. Officer Almer explained that a "roll call" has a different style from other graffiti, and the October 2001 graffiti was not in that style. 6 VRP at 791, 792. And while Officer Almer believes another tagger may have practiced the "HYMN" tag at home, he testified that he does not believe that tagger used the "HYMN" tag in actual graffiti.

¶16 Given this evidence, we agree with the Court of Appeals that the trial court did not abuse its discretion in admitting the challenged ER 404(b) evidence. The fact that there were differences in font, style, medium, and canvas used for the graffiti goes to the *weight* that the jury should

attach to the evidence of the prior acts; they do not render the evidence inadmissible. The degree of similarity petitioners would require is necessary only when a criminal has not signed his or her name. In those cases, we look at all the circumstances of a crime and the perpetrator's acts to try to distinguish a type of signature. Here, the equivalent of a signature was in fact provided: a tag. Where a signature is provided, the signature alone is sufficiently distinctive to be admissible under the modus operandi exception to ER 404(b).

¶17 We do not, however, agree with the trial court's determination that the evidence was also admissible under the common scheme or plan exception. That exception is generally used when the occurrence of the crime or intent are at issue, not when identity is the issue. *DeVincentis*, 150 Wn.2d at 21; *Lough*, 125 Wn.2d at 853. It requires a slightly lower level of similarity, inconsistent with that required to show identity. *DeVincentis*, 150 Wn.2d at 21. The existence of a common scheme or plan, for ER 404(b) purposes, is relevant only to the extent that it shows the charged crime happened. *See Lough*, 125 Wn.2d at 861-62. Since there is no dispute in this case that buildings were vandalized with graffiti or that the vandal intended to paint the graffiti, the trial court abused its discretion by ruling the challenged evidence admissible under the common plan or scheme exception, and the Court of Appeals erred in affirming that decision. The error was, however, harmless, the evidence being properly admitted under the modus operandi exception.

## III

¶18 We conclude that the trial court did not abuse its discretion in admitting this evidence. Although the trial judge may have incorrectly admitted it to show a common scheme or plan, it was clearly admissible to show identity. Differences in font, style, medium, and the objects on which the graffiti was placed go to the weight of the evidence, not

its admissibility. In sum, if a tag like the "mark of Zorro"[3] is left at the crime scene and there is evidence that the person charged with the crime made that mark at other crime scenes, it is admissible. Accordingly, we affirm the Court of Appeals' decision upholding petitioners' convictions.

C. JOHNSON, MADSEN, SANDERS, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., and BRIDGEWATER, J. PRO TEM., concur.

[No. 79432-4. En Banc.]
Argued May 24, 2007. Decided August 2, 2007.

---

[3] The Oregon Supreme Court has noted, "A classic example to illustrate the concept of *modus operandi* having a signature quality is the 'mark of Zorro.'" *State v. Pinnell*, 311 Or. 98, 806 P.2d 110, 118 n.18 (1991).