[No. 27520-5-III. Division Three. March 24, 2011.]

*In the Matter of the Detention of* KEVIN COE.

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN COE, *Appellant*.

812

*Eric J. Nielsen* and *Casey Grannis* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Robert M. McKenna, Attorney General*, and *Malcolm S. Ross, Assistant*, for respondent.

¶1 Brown, J. — Kevin Coe, having served 25 years for first degree rape, appeals his later civil commitment as a sexually violent predator (SVP) under RCW 71.09.060. The State's psychological expert opined Mr. Coe suffers from a mental abnormality or personality disorder making him likely to engage in acts of sexual violence if not confined. Mr. Coe contends the trial court erred in admitting (1) other expert testimony regarding Mr. Coe's unique combination-of-behavior "signature" indicating he committed multiple sexual offenses other than the underlying rape, (2) unadjudicated offenses identified from a statistical database, (3) testimony by some unadjudicated-offense victims, and (4) the psychological expert's opinion because it was partly based on the first three admission errors. Further, Mr. Coe asserts (5) he was denied due-process confrontation and (6) ineffective assistance of his trial counsel in failing to offer a jury instruction defining "personality disorder." We reject his contentions and affirm.

## FACTS

¶2 During the late 1970s through the early 1980s, multiple rapes were committed against women living primarily on the south side of Spokane. Most of the victims were attacked on the city's South Hill, outdoors, in the dark, while the victims were jogging or walking near bus stops. Multiple indecent exposure incidents were similarly reported.

¶3 Police investigators targeted Mr. Coe as the rapist. He was charged in 1981 with five counts of first degree rape and one count of second degree rape. A jury found him guilty of four counts of first degree rape. *State v. Coe*, 101 Wn.2d 772, 774, 684 P.2d 668 (1984). In 1984, our state Supreme Court reversed the convictions mainly due to possible trial prejudice from testimony of witnesses hypnotized before his arrest. *Id.* at 786. At retrial, the jury found Mr. Coe guilty of three of the four rapes. *State v. Coe*, 109 Wn.2d 832, 836, 750 P.2d 208 (1988). Two convictions were again reversed due to the posthypnotic identification testimony. *Id.* at 850. Mr. Coe's first degree rape conviction concerning victim Julie H. was affirmed; Mr. Coe was sentenced to 25 years.

¶4 In August 2006, before Mr. Coe was scheduled for release, the State petitioned the Spokane County Superior Court seeking his involuntary SVP commitment under chapter 71.09 RCW. The court found probable cause and set the matter for trial. Before trial, Mr. Coe moved to exclude certain victim testimony; evidence of unadjudicated offenses; and the testimony of Dr. Robert Keppel, a signature analysis expert regarding the Homicide Investigation Tracking System (HITS) database. And, Mr. Coe asked to limit psychologist Dr. Amy Phenix's testimony to prevent her from relying on that challenged evidence. The court admitted most of the challenged evidence. The jury found that Mr. Coe was an SVP, and the court committed him on October 16, 2008. Mr. Coe appealed.

## OVERVIEW AND STANDARD OF REVIEW

¶5 The sexually violent predators act, chapter 71.09 RCW, provides detailed procedures for civil commitment of persons found to be an SVP. *In re Det. of Post*, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010). Typically, the process begins with the State's filing a petition when a person convicted of a sexually violent offense is about to be released from total confinement. RCW 71.09.030(1). The petition alleges the

offender is an SVP, defined as a person who "suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[1] Former RCW 71.09.020(16) (2006). *In re Det. of Marshall*, 156 Wn.2d 150, 156-57, 125 P.3d 111 (2005). If, after a probable cause hearing, the court decides probable cause exists to believe that the offender is an SVP, the offender is evaluated by a mental health professional and a trial date is set. Former RCW 71.09.040(4) (2001); former RCW 71.09.050(1) (1995).

¶6 Although SVP commitment proceedings are not criminal proceedings, they include some of the same protections as a criminal trial, including the rights to appointment of counsel, a jury trial, proof beyond a reasonable doubt that the offender is an SVP, and jury unanimity. Former RCW 71.09.050(1), (3); RCW 71.09.060(1); *In re Det. of Stout*, 159 Wn.2d 357, 370-71, 150 P.3d 86 (2007). At trial, the State must prove three elements beyond a reasonable doubt: (1) the offender has been charged with or convicted of a crime of sexual violence, (2) the offender suffers from a mental abnormality or personality disorder, and (3) the abnormality or disorder makes the offender "likely to engage in predatory acts of sexual violence if not confined in a secure facility." Former RCW 71.09.020(16). The third element requires finding both causation and that the probability of reoffense exceeds 50 percent. *Post*, 170 Wn.2d at 310. The trier of fact must conclude beyond a reasonable doubt that it is more likely than not that the respondent will engage in predatory acts of sexual violence if not confined. *Id.*

¶7 Mr. Coe first raises challenges to the admission of evidence at the SVP hearing. We review the trial court's decisions to admit or exclude evidence for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004).

---

[1] If the offender has been released from total confinement, the petition must also allege a recent overt act. Former RCW 71.09.030 (1995).

## ANALYSIS

### A. Dr. Keppel

¶8 The issue is whether the trial court erred in admitting Dr. Keppel's "signature analysis" testimony of multiple sexual offenses he attributed to Mr. Coe. Dr. Keppel is a criminal justice professor. Expert testimony is admissible under ER 702 if the witness qualifies as an expert and if the witness's testimony would be helpful to the jury. *State v. Russell*, 125 Wn.2d 24, 69, 882 P.2d 747 (1994). Admission of expert testimony under ER 702 is reviewed for abuse of discretion, and we will not disturb the trial court's ruling if the reasons for admitting or excluding the testimony are fairly debatable. *Id.*; *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001).

¶9 Mr. Coe does not challenge Dr. Keppel's expert witness qualifications. *See Russell*, 125 Wn.2d at 69 (Dr. Keppel has extensive experience in serial crime analysis). He contends Dr. Keppel's signature analysis was not helpful to the jury because (1) the analysis did not show a unique modus operandi (MO) and (2) many of the sexual offenses did not exhibit the unique signature. Basically, Mr. Coe argues this violates ER 404(b). *See State v. Fortin*, 189 N.J. 579, 594, 917 A.2d 746 (2007) (signature crime evidence falls within the category of other crime evidence governed by N.J. R. Evid. 404(b)).

¶10 ER 404(b) prevents a trial court from admitting evidence of other crimes or acts to prove the character of a person and to imply that the person acted in conformity with that character. *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007). Such evidence may be admissible for another purpose, however, such as to prove motive, plan, or identity. ER 404(b). To admit evidence of prior misconduct, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose of the evidence, (3) decide whether the

evidence is relevant to prove an element of the State's case, and (4) find that the probative value of the evidence outweighs its prejudice. *Foxhoven*, 161 Wn.2d at 175. "This analysis must be conducted on the record." *Id.* If the evidence is admitted, the trial court must give the jury a limiting instruction. *Id.*

¶11 The trial court wrote a memorandum opinion analyzing the existence, purpose, relevance, and prejudice of the sexual offenses used by Dr. Keppel in his signature analysis. Mr. Coe did not challenge the occurrence of the unadjudicated offenses, solely his identity as the perpetrator. The court found by a preponderance of the evidence that the offenses occurred and found the reason the State sought admission of uncharged sexual offenses was to show Mr. Coe's "prior sexual history demonstrates his propensity for future violence." Clerk's Papers (CP) at 894. As noted in *In re Detention of Turay*, 139 Wn.2d 379, 401, 986 P.2d 790 (1999), prior sexual history is highly probative of an offender's propensity for future sexual violence. Therefore, the unadjudicated offenses, if committed by Mr. Coe, would be indicative of his threat to the community if not confined. Former RCW 71.09.020(16).

¶12 Mr. Coe argues the unadjudicated sexual offenses are irrelevant because they are insufficiently unique to establish his identity based on MO. Generally, relevant evidence has the tendency to make the existence of any consequential fact more probable or less probable than it would be without the evidence. ER 401; *Post*, 170 Wn.2d at 311; *Foxhoven*, 161 Wn.2d at 176. The trial court's role is to weigh the relevance of particular evidence, and we review the trial court's decision for abuse of discretion. *Foxhoven*, 161 Wn.2d at 176.

¶13 When evidence of prior crimes is introduced to show identity by establishing a unique MO, the evidence is relevant solely if the method used to commit the crimes is so unique that proof the offender committed one of the crimes creates a high probability he committed the others. *Id.* (quoting *State v. Vy Thang*, 145 Wn.2d 630, 643, 41 P.3d

1159 (2002)). The greater the distinctiveness of the method used to commit the crimes, the higher the probability the offender committed the crime and the greater the relevance of the other crimes. *State v. Fualaau*, 155 Wn. App. 347, 357, 228 P.3d 771, *review denied*, 169 Wn.2d 1023 (2010). Individual characteristics of a crime need not be unique in themselves, but the appearance of several common features in the cases mark them as exhibiting a type of "signature." *Foxhoven*, 161 Wn.2d at 179; *Fualaau*, 155 Wn. App. at 357. A signature, once shown, is sufficiently distinctive to be admissible under the MO exception to ER 404(b). *Foxhoven*, 161 Wn.2d at 179.

¶14 Mr. Coe argues the characteristics of the 18 offenses used by Dr. Keppel to show a signature are not unique enough or shared with enough of the offenses to support an MO. Dr. Keppel described a "signature" as a combination of MO elements and ritualistic elements. He defined an offender's "MO" as the behaviors necessary for the offender to successfully perpetrate a crime. The MO "encompasses all behaviors initiated by the offender to procure a victim and complete the criminal acts without being identified or apprehended." CP at 4414. Ritualistic behaviors, on the other hand, are symbolic rather than functional. Although ritual behaviors are unnecessary to accomplish the crime, they derive from the motivation for the crime and the sexual fantasy that expresses it. The trial court stated, "Ritual behaviors are related to psychological and psychosexual needs of the offender." CP at 891. Both the MO and the ritual evolve over time as a result of experience and refinement to more completely reflect the underlying fantasy or to add an unexpectedly arousing aspect of a prior offense.

¶15 Dr. Keppel identified five ritual characteristics concerning Julie H.: (1) intimidation, (2) co-opting the victim to comply, (3) the rapist undoing his own clothing, (4) the necessity of sexual intercourse or ejaculation, and (5) the need to question and engage in conversation with the victim. The intimidation characteristic included surprising

the victim by grabbing her from behind, putting his fingers in her mouth to prevent screaming, throwing her to the ground, using aggressive and offensive words, threatening the victim with a knife that was never seen, and threatening to kill her if she reported the offense. The co-opting characteristic consisted of telling the victim to take off her own clothes, yet using a relatively low level of violence against her. The third ritual characteristic, of the rapist undoing his own pants without demanding assistance, is self-explanatory. The fourth characteristic is evident in the offender's need to masturbate and extensively fondle the victim to attain an erection and to achieve sexual intercourse. Finally, and most distinct, the offender continually spoke to the victim with sexually aggressive language. His sexual questions and statements were described by Dr. Keppel as part of the offender's personal script "that reinforced his emotional and power needs through dominance and control." CP at 4430.

¶16 Using the five ritual characteristics, Dr. Keppel examined over 50 unadjudicated sexual offenses investigators suspected had been committed by Mr. Coe. Dr. Keppel reviewed over 9,000 documents and about 20,000 records and concluded 18 other cases had the same ritual behaviors as found in the Julie H. case. The court found insufficient evidence to conclude Mr. Coe committed 1 of the 18 offenses, so 17 cases were admitted at trial to prove signature identity by ritual characteristics:

Jean C. (4/1978): (1) surprised victim, threatened to hurt her if she screamed, put gloved hand in her mouth, used aggressive and offensive words; (2) low level of violence; (3) rapist unzipped his own pants; (4) vaginal penetration and ejaculation; (5) asked victim if she could urinate or defecate, asked personal questions, described sex acts.

Shelly H. (9/79): (1) surprised victim, tried to put hand in her mouth but she bit him, knocked her to ground and hit her, told her he was going to degrade her, told her to perform fellatio right or he would kill her, told her he knew where she worked and lived and would return if she resisted; (2) told victim to

take off her clothing; (3) rapist removed his own clothes; (4) masturbation, partial penetration with ejaculation; (5) asked victim to urinate on him, asked about boyfriend and masturbation, talked about victim's career.

Paige K. (12/79): (1) grabbed victim and pushed thumb down her throat, knocked her to ground, told her he had a knife and would hurt her if she screamed; (2) low level of violence; (3) no record whether rapist removed his clothes; (4) masturbation, vaginal penetration, external ejaculation; (5) rapist talked continuously, asked victim about her sex experiences and personal details.

Joanne T. (12/79): (1) grabbed victim by covering her mouth, pushed hand in her mouth to prevent screaming, threatened her and told her he would get a knife and come back; (2) low level of violence, told victim to undress; (3) rapist took off his own clothes; (4) masturbation, external ejaculation; (5) asked personal questions and used offensive language.

Dorcas T. (12/79): (1) threatened victim with an unseen knife if she screamed, used aggressive and offensive words; (2) low level of violence; (3) no record whether rapist removed his own clothes; (4) masturbation, attempted penetration, external ejaculation; (5) asked personal and offensive questions.

Darria L. (2/80): (1) rapist confronted victim in street while displaying large dildo and said he needed sex, threatened her; (2) told victim to remove her clothes; (3) rapist removed his own clothes; (4) masturbation, attempted penetration, external ejaculation; (5) asked personal and offensive questions.

Mary L. (3/80): (1) grabbed victim from behind, threatened her with unseen knife, used aggressive and offensive words; (2) told victim to remove her clothes, low level of violence; (3) rapist removed his own clothes; (4) penetration with ejaculation; (5) used aggressive and offensive language and asked personal questions.

Margaret D. (4/80): (1) grabbed victim from behind, threatened her with unseen knife, threw her to ground, used aggressive and offensive words, said he knew where she lived; (2) told victim to remove her clothes, low level of violence; (3) rapist removed his own clothes; (4) penetration with ejaculation; (5) asked personal and offensive questions.

Beth A. (5/80): (1) grabbed victim by the neck and dragged her, exhibited a knife, used aggressive and offensive words,

threatened to kill the victim if she did not shut up; (2) told victim to comply and she would not get hurt; (3) no record whether rapist removed his own clothes; (4) masturbation, penetration, ejaculation; (5) conversation, including offensive sexual statements.

Teresa K. (6/80): (1) grabbed victim by the neck and threw her to ground, forced fingers in victim's mouth and choked her, threatened her with unseen knife, told her he knew where she lived and would kill her if she reported the rape; (2) told victim to remove her clothes, low level of violence; (3) rapist removed his own clothes; (4) penetration and ejaculation; (5) asked personal questions.

Sherry J. (7/80): (1) grabbed victim from behind and threw her to ground, threatened her with unseen knife, used aggressive and offensive words such as "dump a load," threatened to return and kill victim if reported; (2) told victim to remove her clothes, low level of violence; (3) no record whether rapist removed his own clothes; (4) penetration and ejaculation; (5) asked personal and offensive questions.

Gretchen C. (8/80): (1) grabbed victim by the throat and threw her to ground, threatened with unseen knife, threatened to kill victim if she looked at him, used aggressive and offensive language, including asking victim to urinate and defecate; (2) told victim to remove her clothes, low level of violence; (3) no record whether rapist removed his own clothes; (4) penetration; (5) asked personal questions.

Sherry S. (8/80): (1) grabbed victim around her back, forced his fingers down her throat and warned her not to bite, threatened her with unseen knife, used aggressive and offensive words, told her he knew where she lived; (2) told victim to remove her clothes, low level of violence; (3) no record whether rapist removed his own clothes; (4) penetration and ejaculation; (5) asked personal questions and made offensive statements.

Jennifer C. (11/80): (1) grabbed victim around the neck, threatened her with unseen knife, threw her to ground, used aggressive and offensive words; (2) told victim to remove her clothes, low level of violence; (3) no record whether rapist removed his own clothes; (4) masturbation, external ejaculation, vaginal penetration with fingers; (5) asked personal and offensive questions.

Cheri H. (12/80): (1) grabbed victim from behind, forced fingers down her throat, threatened her with unseen knife, warned her not to call police; (2) told victim to walk to wooded area and to take off clothes, low level of violence; (3) rapist unzipped his own pants; (4) penetration with ejaculation; (5) asked personal and offensive questions.

Mary S. (2/81): (1) grabbed victim and pulled to ground, tried to force fingers into her mouth, threatened with unseen knife, covered her face with his hands and her hair, hit victim when she struggled; (2) told victim she would not be hurt if she did what he said, relatively low level of violence; (3) no record whether rapist removed his own clothes; (4) penetrated vagina with fingers, external ejaculation; (5) personal and offensive questions and statements.

Diane F. (2/81): (1) grabbed victim by the mouth, forced his fingers into her mouth, threatened her with unseen knife, used aggressive and offensive words; (2) told victim to remove her clothes, low level of violence; (3) rapist unzipped his own pants; (4) masturbation and penetration; (5) asked personal and offensive questions.

¶17 Dr. Keppel noted the rapist preselected isolated outdoor locations he was familiar with to abduct and rape his victims. The rapist used similar offensive terms, including "fuck," "cunt," and "piss," and discussed his own and the victim's masturbation. CP at 4432, 4436-48. According to Dr. Keppel each of the 17 cases represented "power assertive control-type rapes" with a "highly personalized signature." CP at 4435, 4453. The rapist often acted as though he was being a lover, usually masturbated to achieve an erection, needed to engage the victims in conversation using scripted words, and usually did not actually display the threatening knife. Dr. Keppel concluded the "highly personalized signature" showed the 17 victims were raped by the same person. CP at 4453.

¶18 While courts should not admit expert opinions on commonly understood topics, the inquiry is whether the expert testimony would assist even the knowledgeable juror. *See People v. Prince*, 40 Cal. 4th 1179, 1222, 156 P.3d 1015, 57 Cal. Rptr. 3d 543 (2007). The court reviewed Dr.

Keppel's report and noted additional information support-
ing his conclusion: all of the rapes occurred in a relatively
small geographic area when it was at least partially dark,
and some of the crimes were linked by DNA (deoxyribo-
nucleic acid) and blood evidence. The court found that
although the individual behaviors might not appear unique
in themselves, the combination of behaviors described in
separate incidents indicated the perpetrator's identity. Be-
cause this information was not generally within an ordinary
juror's experience, the trial court decided that the signature
analysis would be useful to the jury's understanding of the
evidence as required by ER 702. We agree.

¶19 The individual aspects of prior acts need not be par-
ticularly unique in themselves to establish MO. *Foxhoven*,
161 Wn.2d at 179; *Fualaau*, 155 Wn. App. at 357. And, when
crimes share a ritualistic quality, "the degree of similarity
between the crimes can be less than that required for
crimes that do not contain such a similarity." *Fualaau*, 155
Wn. App. at 357. In *Fualaau*, the court admitted prior
assault evidence to prove identity in the defendant's assault
trial. The defendant had testified in a prior murder trial
and that testimony showed the defendant's previous as-
sault of the murder victim was similar to the current
assault. *Id.* at 353-54. The assaults shared ritualistic quali-
ties. *Id.* at 358. Both the trial court and the appellate court
concluded that the ritualistic similarities of the two as-
saults made the first assault probative of identity in the
second assault, notwithstanding their dissimilarities. *Id.*

¶20 In sum, whether prior offense similarities support a
signature is left to trial court discretion. *See Foxhoven*, 161
Wn.2d at 177. Dissimilarities go to weight, not admissibil-
ity. *Id.* at 178-79. The court found Dr. Keppel's analysis
showed a unique signature after engaging in an ER 404(b)
analysis: that the prior offenses occurred; they were needed
to establish Mr. Coe's identity; they were relevant to prove
his propensity for future sexual violence; and the probative
value of the signature analysis offenses outweighed their

prejudice. *Id.* at 175. We conclude the trial court properly exercised its discretion in allowing Dr. Keppel's expert signature analysis testimony because it was helpful to the jury in determining the rapist's identity and his propensity for future sexual violence.

## B. HITS Evidence

¶21 The issue is whether the trial court erred in admitting evidence of numerous unadjudicated sexual offenses linked to Mr. Coe in the HITS database. At trial, attorney general employee Tamara Matheny testified she used the HITS database to determine how many sexual crimes reported in Washington had characteristics similar to the Julie H. rape. Pretrial, Mr. Coe unsuccessfully moved to suppress this evidence. On appeal, he contends the HITS evidence is improper because it did not establish a unique signature, contained inadmissible hearsay, and was unreliable and misleading.

¶22 Dr. Keppel was instrumental in establishing the HITS database in 1987, modeled on the federal Violent Criminal Apprehension Program (ViCAP). The database contains information on violent crimes, including violent sexual crimes. HITS investigators began collecting separate sexual assault data in 1992. When the database was used here, it contained information on 8,100 sexual assaults. Typically, state law enforcement agencies send data on solved and unsolved crimes to HITS Unit investigators. The DOC (Department of Corrections) sends the unit information on an offender's past crimes and suspected crimes when the offender is facing the end-of-sentence review before release from prison. Although several states send crime information to the HITS database, most information is from Washington cases.

¶23 Law enforcement or HITS Unit personnel enter the information on HITS forms, breaking it down into specific coded details. It is then entered into the HITS database. The sexual assault form contains questions covering about

180 variables. Police investigators and prosecutors access the database by asking the HITS Unit to run queries based on particular crime details, resulting in a list of similar cases. The HITS database is typically used "to assist in sifting through large amounts of data associated with particular crimes to develop investigative leads based on similarities in *modus operandi* factors." CP at 4370.

¶24 In *Russell*, 125 Wn.2d at 69, Dr. Keppel and another witness referred to HITS and ViCAP during their testimony on the rarity of a certain aspect of the three crimes charged. The court concluded these databases "are nothing more than sophisticated record-keeping systems," and "there is no prohibition against using well-founded statistics to establish some fact that will be useful to the trier of fact." *Id.* at 70.

¶25 Pretrial, Mr. Coe unsuccessfully challenged the admission of information from the HITS database as unreliable and prejudicial. Citing *Russell, id.* at 69-70, the trial court found the HITS database was properly used to seek MO and ritual characteristics similar to the Julie H. rape and to assemble the data in a meaningful way. The trial court concluded, "Like any other database, what is input into it and what is queried is influenced by the people doing the work. This goes to the weight which should be given to this evidence, not its admissibility." CP at 891.

¶26 On appeal, Mr. Coe asserts, as he did at the trial court, that the database and the queries were manipulated by the State to produce a list of unadjudicated sexual offenses the State wanted to link to Mr. Coe. He attempted to discredit the results by cross-examining Ms. Matheny and other witnesses from the HITS Unit regarding offense coding and the number of queries run before the final results were reached.

¶27 Ms. Matheny's testimony shows she was a highly skilled HITS coder, who had coded about 500 cases. She was the trainer for all HITS investigators on the coding form. In 2006, at the prosecutor's request, she entered data from the six offenses originally charged. Later, the prosecutor asked

her to enter data from 18 other reported sexual assaults. Ms. Matheny entered data including DOC information, police investigative reports, and medical records. Invariably, Ms. Matheny entered the data in a manner consistent with her standard coding practice. She was not asked by the prosecutor to code the cases in a particular way. Later, she conducted HITS queries with search criteria provided by the prosecutor, a common practice.

¶28 The last three query runs in December 2007 removed redundant criteria and added criteria to narrow the results. She started with seven criteria: (1) the offender was Caucasian, (2) the offender was male, (3) the assault was outdoors, (4) the offender was a stranger, (5) the initial contact site was the same as the first sexual assault site, (6) force was used immediately, and (7) the offender asked the victim questions. The 26 cases, including Julie H., resulting from this run represented 0.3 percent of the 8,100 sexual offenses in the database. Two criteria were added: a weapon was used, a cutting or stabbing instrument, resulting in 16 similar cases representing 0.21 percent of the database. Fourteen of the 16 cases were from Spokane County, including Julie H. Finally, one last criterion was added: the use of the weapon was implied and not seen, resulting in 14 cases representing 0.17 percent of the sexual assault database. Thirteen of these final cases were admitted at trial, including the Julie H. case. These 13 were: Paige K. (12/79), Dorcas T. (12/79), Mary L. (3/80), Margaret D. (4/80), Teresa K. (6/80), Sherry J. (7/80), Gretchen C. (8/80), Sherry S. (8/80), Julie H. (10/80), Jennifer C. (11/80), Cheri H. (12/80), Mary S. (2/81), and Diane F. (2/81).[2] Based on her 19 years of experience, Ms. Matheny testified the combination of characteristics represented in the final query run was rare.

¶29 Mr. Coe argues the HITS search criteria were more ordinary than the signature features identified by Dr. Keppel and not unique enough to establish an MO. Even

---

[2] All of the cases produced in the final HITS query are included in the cases independently linked to Mr. Coe by Dr. Keppel.

when the individual characteristics of a crime are not unique, their combination may distinguish them as a unique signature. *Foxhoven*, 161 Wn.2d at 179; *Fualaau*, 155 Wn. App. at 357. Considering all, including Ms. Matheny's testimony that the combined characteristics used in the HITS queries were rare, we conclude the trial court did not abuse its discretion in admitting the final HITS results to show the same perpetrator probably committed the 14 crimes. *Foxhoven*, 161 Wn.2d at 176.

¶30 Next, Mr. Coe argues, as he did at the trial court, that the HITS database is based on inadmissible hearsay. He cites *People v. Hernandez*, 55 Cal. App. 4th 225, 240, 63 Cal. Rptr. 2d 769 (1997), holding a sex crimes database based on victim observations in police reports is inadmissible hearsay because the victims lack an official duty to observe and report relevant facts. "Hearsay" is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is not admissible unless it qualifies as an exception to the hearsay rule by court rule or by statute. ER 802. One of those exceptions is the business records statutory exception of RCW 5.45.020, which authorizes the admission of otherwise inadmissible records if they are made and kept in the ordinary course of business. *State v. Hines*, 87 Wn. App. 98, 100, 941 P.2d 9 (1997). Generally, a police officer's investigative summary is inadmissible hearsay that does not qualify for admission under the business records exception to the hearsay rule. *Id.* at 101-02.

¶31 Even if the basis of the HITS database is hearsay, however, the trial court's admission of database query results was not an abuse of discretion. The HITS information was one of several methods used by Dr. Phenix to link Mr. Coe to multiple unadjudicated sexual offenses, which in turn supported her opinion that Mr. Coe is an SVP. ER 703 authorizes an expert to base her opinion on data that is not otherwise admissible as long as the data is of a type reasonably relied upon by experts in her field. *Marshall*,

156 Wn.2d at 162. Dr. Phenix testified the HITS analysis was the type of evidence she and other psychologists would rely upon in conducting an SVP analysis. And, the trial court appropriately instructed the jury to consider the factual bases of Dr. Phenix's expert opinion solely to decide what credibility and weight should be given to her opinion. The jurors were further instructed that they "may not consider it as evidence that the information relied upon by the witness is true or that the evidence described actually occurred." Report of Proceedings (RP) at 3086; *see also* CP at 3478 (Instruction 3). With these limiting instructions, the trial court properly allowed admission of the HITS results as one of the bases for Dr. Phenix's expert opinion. ER 705; *Marshall*, 156 Wn.2d at 163.

¶32 Next, Mr. Coe argues the HITS results were unreliable because the database is incomplete and Ms. Matheny's methods of entering the data were not proved to be trustworthy. Thus, he asserts the trial court shifted the burden of proving the statistical validity of the HITS results to him, forcing him to prove their invalidity.

¶33 At the pretrial HITS-evidence exclusion hearing, Mr. Coe's counsel argued she believed the HITS database was not statistically valid because sexual assaults are often unreported. The trial court interrupted and said, "Excuse me Counsel, I don't mean to insult you. But what you believe isn't important, it's what you demonstrated to me through evidence. And I don't have any evidence whatsoever on the statistical validity of the studies." RP at 4035. The court added, "So we have to confine your arguments to what evidence you provided to the Court." RP at 4035-36. Those comments by the trial court do not reflect a shift in the burden of proof, but the limitation of the argument to the evidence actually presented to the court.

¶34 At the day-long hearing on Mr. Coe's exclusion motion, the State presented three witnesses and several exhibits supporting HITS database reliability. Mr. Coe presented no witnesses. The trial court concluded the HITS results were reliable and sufficiently unique to allow the

perpetrator's identity evidence. Although the trial court recognized a subjective component existed in filling out the coding forms, the court concluded this human component in the process could be brought to the jury's attention.

¶35 Mr. Coe provides no evidence showing the HITS database is invalid or was manipulated by Ms. Matheny, or any lack of standard procedure. He mainly cites to his exclusion memorandum on this point. Given all, we defer to the trial court's credibility and weight determinations in deciding reliability. *Foxhoven*, 161 Wn.2d at 176; *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

¶36 Finally, Mr. Coe argues the HITS results were unfairly presented to show he committed numerous other offenses as statistical certainty. He asserts the use of the HITS database gave a false aura of computer infallibility showing him as the perpetrator. Basically, he argues the danger of unfair prejudice outweighed the probative value of the HITS evidence. ER 403 (even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).

¶37 Like Dr. Keppel's signature analysis, the trial court engaged in a full four-step ER 404(b) analysis of the HITS results. The court found (1) the unadjudicated offenses occurred, (2) they helped establish the rapist's prior sexual history and propensity for future violence, (3) they were relevant to whether Mr. Coe is an SVP under RCW 71.09-.060, and (4) the probative value of the offenses and the signature analysis outweighed their prejudice. *Foxhoven*, 161 Wn.2d at 175.

¶38 Mr. Coe's citation to *Hernandez*, 55 Cal. App. 4th 225, is unhelpful. In *Hernandez*, a computer database was searched to find crimes with the same MO committed when the defendant lived in a particular area and after his arrest to show the absence of similar crimes with the same MO. Because the database might have omitted pertinent evidence of subsequent crimes, the *Hernandez* court concluded a proper foundation had not been established. *Id.* at 240. Here, that the prosecutor did not seek to show the absence

of similar crimes after Mr. Coe was arrested proved he committed the unadjudicated offenses. Admitting the evidence with limiting instructions allowed Mr. Coe to cross-examine the HITS witnesses regarding weight.

¶39 In sum, prior sexual history is highly probative of an offender's propensity for future sexual violence. *Turay*, 139 Wn.2d at 401. The trial court properly applied ER 404(b) and concluded the State had presented a proper foundation to admit the unadjudicated offenses derived from HITS. Moreover, the trial court noted Dr. Phenix considered more than the HITS results when determining Mr. Coe met the SVP definition. And the jury was instructed that none of the information Dr. Phenix used should be considered as true facts. Mr. Coe fails to show the trial court abused its discretion. *Foxhoven*, 161 Wn.2d at 174-75.

### C. Unadjudicated Rape Victim Testimony

¶40 The issue is whether the trial court abused its discretion by admitting the testimony of seven unadjudicated rape victims. Namely: Shelly M. (formerly Shelly H.), Joanne T., Margaret D., Mary L., Mary S., Sherry S., and Diane F. These victims were linked in either the final HITS query runs or Dr. Keppel's signature analysis or in both.

¶41 This issue is predicated on Mr. Coe's earlier rejected HITS and signature evidence contentions. These rejections fatally undermine his arguments that without the HITS and signature evidence, the testimony of the seven victims would not have been relevant. Sexual misconduct is highly probative of an offender's propensity for future sexual violence. *Turay*, 139 Wn.2d at 401. The court correctly performed the necessary ER 404(b) analysis before allowing the HITS and signature analysis evidence. *Foxhoven*, 161 Wn.2d at 174-77. " 'Whether the prior offenses are similar enough . . . to warrant admission is left to the discretion of the trial court.' " *Id.* at 177 (quoting *State v. Jenkins*, 53 Wn. App. 228, 236, 766 P.2d 499 (1989)). Given the failure of Mr. Coe's predicate contentions he shows no abuse of discretion.

## D. Due Process Confrontation

¶42  The issue is whether admission of evidence of sexual assault against victims who were unavailable for deposition or trial violated Mr. Coe's due process right to confront the witnesses against him. Dr. Phenix testified she considered two rapes of Darria L., the rape of Diana A., the attempted rape of Valerie L., indecent exposure against Mary O., and indecent exposure against Claudia H. in forming her opinion that Mr. Coe was an SVP. None were available for deposition or trial.

¶43  It is well settled that the Sixth Amendment confrontation right is not available to a person challenging an SVP commitment. *Stout*, 159 Wn.2d at 369; *In re Det. of Allen*, 142 Wn. App. 1, 4, 174 P.3d 103 (2007). Because involuntary civil commitment is a significant deprivation of liberty, however, those facing SVP commitment are entitled to due process of law. *Stout*, 159 Wn.2d at 369.

¶44  Due process guarantees the right to be heard, "but its minimum requirements depend on what is fair in a particular context." *Id.* at 370. To determine what procedural due process is required in an SVP proceeding, *Stout* applied the *Mathews* test, balancing (1) the private interest affected; (2) the risk of erroneously depriving that interest with existing procedures and the probable value—if any—of additional procedural safeguards; and (3) the governmental interest, including increased costs and the administrative burden of additional procedures. *Id.*; *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Although noting that the first *Mathews* factor weighs heavily in the SVP's favor, the *Stout* court concluded a minimal risk exists of erroneously depriving the SVP detainee of his or her liberty under the second factor because SVP detainees have a comprehensive set of rights. *Stout*, 159 Wn.2d at 370. "Given these significant protections," *Stout* concluded, "it is unlikely an SVP detainee will be erroneously committed if he is not also able to

confront a live witness at commitment or be present at a deposition." *Id.* at 371. The *Stout* court concluded the third *Mathews* factor balanced in favor of the State, which has an interest in protecting the community from sex offenders who are facing an SVP commitment several years after the sexual offenses occurred. *Id.* at 371-72.

¶45 Consequently, the *Stout* court held an SVP detainee has no due process right to confront a live witness at the commitment hearing or to be present at a witness deposition. *Id.* at 374; *see also Allen*, 142 Wn. App. at 4-5. Mr. Coe attempts to distinguish *Stout* on its facts. The offender in *Stout* did not attend the telephonic depositions of a victim who refused to return to Washington for the SVP commitment trial. Because the offender had an opportunity to cross-examine the witness at the deposition, the *Stout* court reviewed solely his confrontation claim. *Stout*, 159 Wn.2d at 368. Nevertheless, the court applied the *Mathews* procedural due process test to the right to confront live witnesses as well as to the right to be present at a deposition. *Id.* at 370-71. Under *Stout*, Mr. Coe had no due process right to confront the unavailable witnesses either at depositions or at the SVP trial. *Id.* at 374. Accordingly, no procedural due process violation occurred.

### E. Dr. Phenix

¶46 The issue is whether the trial court erred in allowing Dr. Phenix to base her SVP opinion upon the HITS results and Dr. Keppel's signature analysis. Mr. Coe contends the trial court erred in allowing Dr. Phenix to disclose the unadjudicated sexual offenses while explaining the bases of her opinion.

¶47 Dr. Phenix is a California-licensed clinical psychologist specializing in sex offender risk assessment and evaluation. *Marshall*, 156 Wn.2d at 154. She has completed about 370 SVP evaluations in California, Washington, and several other states. Dr. Phenix spent approximately 500 hours over two and one-half years reviewing 74,000 pages of Mr.

Coe's record, including legal, medical, mental health, and DOC records as well as witness depositions and Mr. Coe's writings and audiotapes. She conducted two face-to-face interviews with Mr. Coe by court order. She is a forensic psychologist specializing in sex offenders.

¶48 Dr. Phenix testified she reviewed all the records of offenses—whether they resulted in charges or not, compared them to the Julie H. offense that resulted in a conviction, and concluded that a total of 33 sexual offenses could be credited to Mr. Coe. She also considered the results of the HITS queries and of Dr. Keppel's signature analysis as data reinforcing her conclusion he committed these offenses. She explained these materials are the types of records professionals in her field rely upon when evaluating whether an offender is an SVP. *See also Marshall*, 156 Wn.2d at 155 (wherein Dr. Phenix relied upon similar records for an SVP evaluation).

¶49 Of the 33 offenses, Dr. Phenix discussed 20 at trial, and 13 of those victims did not testify. Before Dr. Phenix began discussing the details of these offenses, the trial court instructed the jury:

> Ladies and gentlemen, if you recall I read an instruction to you yesterday prior to Dr. Keppel's testimony, and let me just reiterate that instruction again for Dr. Phenix's testimony. And that is that generally witnesses testify only to things they observe. However, some witnesses are permitted to give their opinion in addition to their observations. In order to assist you in evaluating an opinion, a witness may be allowed to give the basis for the opinion. In some circumstances, testimony about the basis for an opinion is not appropriate for you to consider for other purposes. Dr. Phenix is about to testify regarding the factual bases of her opinion. You may consider this testimony only in deciding what credibility and weight should be given to the opinions of Dr. Phenix. You may not consider it as evidence that the information relied upon by the witness is true or that the evidence described actually occurred.

RP at 3085-86. The jury received a similar admonition in its written instructions.[3]

¶50 Expert testimony is admissible if the expert is properly qualified, relies on generally accepted theories, and is helpful to the trier of fact. ER 702; *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); *Russell*, 125 Wn.2d at 69. The expert must testify within her area of expertise and must back her testimony with a sufficient factual foundation. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 104, 882 P.2d 703, 891 P.2d 718 (1994). Admission of expert testimony is reviewed for abuse of discretion. *Russell*, 125 Wn.2d at 69.

¶51 Mr. Coe does not challenge Dr. Phenix's credentials as an expert SVP evaluator or her psychological theories. She is recognized in Washington courts as an expert in this area. *See Marshall*, 156 Wn.2d at 160. But he contends her reliance on the unreliable HITS and signature analysis evidence made her testimony unhelpful. The trial court ruled this evidence was reliable, supported by the testimony of the expert witnesses, and useful to the trier of fact. Additionally, the trial court ruled Dr. Phenix could consider Dr. Keppel's signature analysis and the HITS information as information reasonably relied upon to determine whether Mr. Coe is an SVP.

¶52 As decided above, the trial court did not abuse its discretion in admitting the HITS and signature evidence. It follows that the trial court did not abuse its discretion in allowing Dr. Phenix to reasonably rely on this evidence in developing her expert opinion. ER 702, 703; *Marshall*, 156 Wn.2d at 161-62. Moreover in the context of Dr. Phenix's testimony, the error was harmless. Dr. Phenix testified she examined about 74,000 pages of record. She

---

[3] In instruction 3 on expert testimony, the court stated in part, "When Drs. Keppel, Phenix and Donaldson testified, I informed you that some information was admitted as part of the basis for his or her opinion, but may not be considered for other purposes. You must not consider this testimony as proof that the information relied upon by the witness is true. You may use this testimony only for the purpose of deciding what credibility or weight to give the witness's opinion." CP at 3478.

linked multiple unadjudicated sexual crimes to Mr. Coe without consideration of HITS or Dr. Keppel's report. She probably would have decided that Mr. Coe met the definition of an SVP without considering the HITS results or the signature analysis. Because it is not reasonably probable that the trial's outcome would have been materially affected by excluding the HITS results or Dr. Keppel's signature analysis, any error in admitting them and allowing Dr. Phenix to consider them is harmless. *State v. Braham*, 67 Wn. App. 930, 939, 841 P.2d 785 (1992).

¶53 The trial court properly exercised its discretion in allowing Dr. Phenix to discuss the unadjudicated sexual offenses she attributed to Mr. Coe. ER 703 allows an expert to base her opinion on data that would otherwise be inadmissible in evidence. *Marshall*, 156 Wn.2d at 162 (citing *Russell*, 125 Wn.2d at 73-74). The expert may not, however, report inadmissible matters as substantive evidence. *Id.* at 163. ER 705 authorizes the court to allow the expert to relate inadmissible evidence to explain the basis for the expert opinion, subject to appropriate limiting instructions. *Id.* The trial court allowed Dr. Phenix to discuss details of unadjudicated offenses as they related to the second and third elements of a finding that an offender is an SVP: the offender suffers from a mental abnormality or personality disorder, and the abnormality or disorder makes it likely that the offender will engage in predatory acts of sexual violence if not confined. Former RCW 71.09.020(16). Before Dr. Phenix discussed the unadjudicated offenses and in the concluding written instructions, the trial court gave the jury a proper limiting instruction. *Marshall*, 156 Wn.2d at 163.

¶54 The jury is presumed to follow the court's instructions. *State v. Yates*, 161 Wn.2d 714, 763, 168 P.3d 359 (2007). Mr. Coe contends the limiting instructions require mental gymnastics beyond a jury's power. He cites *Bruton v. United States*, 391 U.S. 123, 132 n.8, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), which held that jurors cannot be expected to follow a court's instruction to consider the incriminating confession

of a nontestifying codefendant only against the codefendant. The *Bruton* Court held in a situation with codefendants, the risk that the jury will not follow the court's instructions is too great. *Id.* at 135. But the United States Supreme Court in *Richardson v. Marsh*, 481 U.S. 200, 207-09, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) noted that *Bruton* is a narrow exception to the almost invariable assumption of the law that jurors follow their instructions. Notably, the codefendant in *Bruton* expressly implicated the defendant as his accomplice. *Id.* at 208. When other evidence is required to incriminate, it is less likely the jury would disobey an instruction to disregard the confession. *Id.*

¶55 The unadjudicated sexual offenses discussed by Dr. Phenix were not used as evidence to incriminate Mr. Coe and were not as " 'powerfully incriminating' " as a confession of a codefendant. *Id.* (quoting *Bruton*, 391 U.S. at 135). Admitting similar inadmissible material by Dr. Phenix was approved by our state Supreme Court in *Marshall*, 156 Wn.2d at 163, with a limiting instruction. Given all, we conclude the court did not abuse its discretion in allowing Dr. Phenix to partly rely on the HITS and signature evidence, and to disclose the factual basis for her SVP opinion.

## F. Counsel Effectiveness

¶56 The issue is whether Mr. Coe's trial counsel was ineffective for failing to offer a jury instruction defining "personality disorder." To prove ineffective assistance of counsel, Mr. Coe must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A deficient performance falls below an objective standard of attorney reasonableness. *In re Det. of Moore*, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). Prejudice occurs if it is reasonably probable the deficient performance affected the outcome of the proceedings. *Id.* We strongly presume effective assistance.

*Id.* Mr. Coe carries the burden of showing his counsel had no strategic basis for his conduct. *Id.*

¶57  At trial, the jury was instructed the State must prove beyond a reasonable doubt Mr. Coe "suffers from a mental abnormality or personality disorder which causes serious difficulty in controlling his sexually violent behavior." CP at 3480. "Mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit criminal sexual acts to a degree that makes the person a menace to the health and safety of others." CP at 3481. The jury was not instructed on the definition of "personality disorder." When Mr. Coe was tried in 2008, "personality disorder" was not defined in the SVP statute, while "mental abnormality" was. Former RCW 71.09.020(8). In 2009, the legislature defined "personality disorder" as

> an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment. Purported evidence of a personality disorder must be supported by testimony of a licensed forensic psychologist or psychiatrist.

RCW 71.09.020(9); LAWS OF 2009, ch. 409, § 1.

¶58  In 2010, the Washington Supreme Court decided *In re Detention of Pouncy*, 168 Wn.2d 382, 229 P.3d 678 (2010). The jury in *Pouncy* was instructed to find the respondent suffered either a mental abnormality or a personality disorder and was given a definition of "mental abnormality." Mr. Pouncy's proposed instruction defining "personality disorder" was rejected by the trial court; no other instruction defining this term was given. The Washington Supreme Court held the trial court abused its discretion by refusing to define "personality disorder" to the jury. *Id.* at 391. The term is not in common usage and implicates an element of the State's case, making it impossible to know what definition the jury may have used; the court held the failure to

define "personality disorder" was not harmless error. *Id.* at 391-92.

¶59 Before *Pouncy*, defining "personality disorder" was unnecessary under state case law. For example, this court in *In re Detention of Twining*, 77 Wn. App. 882, 895-96, 894 P.2d 1331 (1995) held no "personality disorder" instruction was necessary because it was not statutorily defined and each party could argue its understanding of the term's meaning. *Pouncy*, 168 Wn.2d at 390. Although *Pouncy* abrogated *Twining*, the *Twining* decision was still good law at the time of Mr. Coe's trial. And, the legislature had not defined the term at the time of Mr. Coe's trial. His suggestion that trial counsel should have sought an instruction on the definition anyway is insufficient to rebut the presumption of counsel effectiveness. Thus, he fails to show his counsel's failure to request an instruction defining "personality disorder" fell below an objective standard of reasonableness and was therefore deficient. *Moore*, 167 Wn.2d at 122.

¶60 Considering the evidence, Mr. Coe shows no prejudice. Dr. Phenix defined "personality disorder" generally. RP at 3157. She elaborated on her "personality disorder" definition without objection. RP at 3157-58. She diagnosed Mr. Coe with a personality disorder not otherwise specified, with traits of antisocial, narcissistic, and histrionic personality disorders. Dr. Phenix related the definition of "personality disorder not otherwise specified" with certain traits, using the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) (DSM). Dr. Theodore Donaldson, Mr. Coe's psychological expert, did not challenge her definitions or the DSM. He agreed Mr. Coe had the personality disorders. He related his view that DSM personality disorders do not predispose anyone to be an SVP. Because the meaning of "personality disorder" was not disputed, Mr. Coe does not show that the failure to request an instruction defining the term affected the outcome of the trial. *Moore*, 167 Wn.2d at 122.

¶61 In sum, Mr. Coe shows neither defective performance nor prejudice. Thus, his claim of ineffective assistance of counsel is without merit. *Strickland*, 466 U.S. at 687-88. Having reasoned the trial court committed no error in any of the issues presented by Mr. Coe, we do not reach his cumulative error contentions.

¶62 Affirmed.

SWEENEY and SIDDOWAY, JJ., concur.

Review granted at 172 Wn.2d 1001 (2011).