COURT OF APPEALS DIV I
2017 JUN -5 AM 8: 50


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of )
) No. 74248-5-I
)
JAMES TAYLOR TURNER, )
) DIVISION ONE
)
          Appellant. )
) UNPUBLISHED OPINION
)
)
)
) FILED: June 5, 2017
)

APPELWICK, J. — A jury found Turner to be a sexually violent predator. Turner argues that the evidence was insufficient to show that he suffered from a mental abnormality, that he committed a recent overt act, or that he is more likely than not to reoffend. He also argues that the State's expert should not have been permitted to testify that an actuarial formula underestimated Turner's likelihood of reoffending. We affirm.

## FACTS

In 2007, James Turner pleaded guilty to two counts of second degree child molestation and two counts of communication with a minor for immoral purposes. The charges arose from Turner having sexual contact with S.P., who was 13 at the time. Turner was 20 at the time, but he had told S.P.'s mother that he was 15 so that S.P.'s mother would allow S.P. to be around Turner.

After pleading guilty to the crimes involving S.P., Turner also disclosed that he had molested his half sister, S.H. The abuse began when S.H. was six or

seven. Turner was about eight years older than S.H. Turner abused S.H. until Turner moved out of his mother's house at 18.

When he was released from prison, Turner was placed in the Department of Corrections' Offender Community Reentry Safety Program. Turner's community corrections officer (CCO) testified that Turner committed a number of community custody violations after his release. He used the internet to try to contact S.P. Another violation involved Turner meeting a 14 year old at a bus stop and eventually kissing her in a park.

Turner also was pursuing a relationship with an adult woman named Joanna Calderon online and by telephone. The two met over the internet. They engaged in phone sex involving role play. Calderon sometimes pretended to be a teenager as young as 13. The role play involved sexual relationships between brother-sister, uncle-niece, grandfather-granddaughter, and teacher-student.

On another occasion, Turner began exchanging text messages with 15 year old T.A. His CCO discovered the relationship after she noticed Turner texting T.A. a poem that stated "Roses are red like a sweet, tender kiss engulfs the soul and fuels the heart. There is only one word for this: DESIRE." Turner invited T.A. to lunch and had asked her if she would like a massage. He asked T.A. if he was a "bad boy" for talking to her.

In August 2014, the State petitioned to have Turner committed as a sexually violent predator (SVP). At trial, the State presented expert testimony from Dr. Brian Judd. Dr. Judd testified that Turner suffered from pedophilic disorder, nonexclusive. And, Dr. Judd testified that Turner's communication with

2

T.A. amounted to a recent overt act that justified commitment. Turner presented testimony from Dr. Paul Spizman, who testified that Turner did not suffer from pedophilic disorder.

The jury found beyond a reasonable doubt that Turner qualified as an SVP. The trial court entered an order of commitment. Turner appeals.

## DISCUSSION

Turner argues that the trial court erred in allowing the State's expert to testify that an actuarial tool underestimated his likelihood of reoffending. Turner also argues that the evidence was insufficient to show that he is a sexually violent predator.

I.      Expert testimony

Turner contends that the trial court violated both ER 702 and ER 403 when it allowed Dr. Judd to testify that an actuarial formula underestimated Turner's likelihood of reoffending.

Dr. Judd testified that one actuarial tool, Static 99-R, put Turner's likelihood of reoffending at 21.2 percent within five years, and 32.1 percent within 10 years. But, he stated that this tool underestimates the actual risk of reoffending for two reasons.

First, it accounts for only "rap sheet sexual recidivism." That is, the tool uses data about only crimes that are explicitly sexual offenses. But, it does not account for crimes that are not explicitly sexual, but are sexually motivated. For example, Dr. Judd noted that a crime such as kidnapping may be sexually motivated, but not accounted for in the Static 99-R, because it is not an explicitly

sexual offense. According to Dr. Judd, many crimes can be sexually motivated even if they are not explicitly sexual.

Second, Dr. Judd also opined that the Static 99-R tool underestimated risk of reoffending, because research shows that the majority of sexually motivated crimes go unreported. For these two reasons, he concluded that the Static 99-R tool underestimated the risk of reoffending "at multiple levels."

ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Admissibility of expert testimony under ER 702 is within the trial court's discretion. In re Det. of Coe, 160 Wn. App. 809, 818, 250 P.3d 1056 (2011), aff'd, 175 Wn.2d 482, 283 P.3d 29 (2012). ER 702 requires that expert testimony be based on sufficient foundational facts to support the expert's opinion. State v. Pittman, 88 Wn. App. 188, 198, 943 P.2d 713 (1997).

Actuarial instruments are often used in SVP trials to aid in the prediction of an offender's future dangerousness. See, e.g., In re Det. of Thorell, 149 Wn.2d 724, 753, 72 P.3d 708 (2003). Our Supreme Court has held that actuarial tools satisfy the Frye[1] standard and are admissible evidence. See id. at 755-56.

In Thorell, the court held that conflicting conclusions on likelihood of reoffending between clinical and actuarial assessments go to the weight of the evidence, rather than admissibility. Id. at 753-54, 756. Thus, when an expert's

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)

clinical opinion conflicts with an actuarial tool, both are admissible and the jury may weigh each source of evidence. See id. at 756.

Turner claims that Dr. Judd's comments on the Static 99-R's shortcomings were impermissibly speculative. But, Dr. Judd cited scientific sources for his claim that most sexual offenses go unreported. Specifically, he cited a study showing that, for every 30 sex offenses, offenders are arrested for only one actual offense. He also cited a study showing that only 33 percent to 45 percent of sexual assaults are reported. And, he gave an example of one of Turner's acts that was not prosecuted, and therefore did not factor into the Static 99-R assessment. Therefore, he testified that the Static 99-R's input variables are imperfect, and the results were accordingly imperfect. In Thorell, the court noted that actuarial tools "may be adjusted (or not) by expert evaluators considering potentially important factors not included in the actuarial measure." Id. at 753. The trial court did not abuse its discretion in determining that Dr. Judd's comments on the reliability of the Static 99-R tool were relevant and not overly speculative.

Second, Turner claims that the probative value of Dr. Judd's comments on the Static 99-R test was substantially outweighed by the danger of unfair prejudice.

Under ER 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. In Thorell, the court noted that testimony regarding future dangerousness of SVPs is inherently prejudicial. Id. at 758. But, it nevertheless observed that the probative value of

5

such testimony is high, and it is directly relevant to whether the SVP elements are satisfied. Id.

Like the tool itself, an expert's comments on "important factors not considered in the actuarial measures" are relevant. See id. at 753. And, although Dr. Judd's comments were inherently prejudicial given that he believed Turner's chances of reoffending were higher, that prejudice was not especially unfair. Given that our Supreme Court has deemed similar testimony highly probative and directly relevant, the trial court did not abuse its discretion in allowing Dr. Judd's testimony about the likelihood of reoffending.

## II. Sufficiency of Evidence

Turner next contends that the State's evidence at trial was insufficient. In a sufficiency challenge, the evidence is viewed in the light most favorable to the State. In re Det. of Audett, 158 Wn.2d 712, 727, 147 P.3d 982 (2006). A claim of insufficiency admits the truth of the State's evidence. In re Det. of Broten, 130 Wn. App. 326, 334-35, 122 P.3d 942 (2005). We draw all reasonable inferences in favor of the State, and interpret them most strongly against the respondent. Audett, 158 Wn.2d at 727. The appellate court defers to the trier of fact regarding a witness' credibility, conflicting testimony, and the persuasiveness of the evidence. Broten, 130 Wn. App. at 335. The commitment will be upheld if any rational trier of fact could have found the essential elements beyond a reasonable doubt. Audett, 158 Wn.2d at 727-28.

In order to uphold an SVP commitment, a court must find that the jury had sufficient evidence to find (1) that the respondent had been convicted of or

charged with a crime of sexual violence; and (2) that the respondent suffers from a mental abnormality or personality disorder; and (3) that such mental abnormality or personality disorder makes the respondent likely to engage in predatory acts of sexual violence if not confined in a secure facility. Id. at 727. If, as here, the respondent is living in the community after release from custody, the State must also prove beyond a reasonable doubt that the person has committed a "recent overt act." RCW 71.09.060(1).

A. Mental Abnormality

Turner contends that the evidence was insufficient to show that he suffers from a mental abnormality. Specifically, he contends that the Dr. Judd's diagnosis of pedophilic disorder was not supported by sufficient facts.

RCW 71.09.020(8) defines "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." No technical diagnosis of a particular mental abnormality definitively renders an individual either an SVP or not. Thorell, 149 Wn.2d at 761-62.

At trial, the State's expert, Dr. Brian Judd, testified that Turner suffers from pedophilic disorder. Dr. Judd relied on the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). AM. PSYCHIATRIC ASS'N, DIAGNOSTICS AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th Ed. 2013). Citing the DSM-5, Dr. Judd's psychosexual evaluation listed three criteria for pedophilic disorder are: (1) that the individual has recurrent, intense, sexually arousing fantasies, urges, or

7

behaviors involving sexual activity with a prepubescent child, generally age 13 or younger, over a period of at least six months, (2) that the individual has acted on these urges, or the urges and fantasies cause marked distress or interpersonal difficulty, and (3) that the individual is at least 16 years of age and at least five years older than the child or children at issue.

Dr. Judd's diagnosis relied primarily on Turner's sexual acts with S.H. and S.P. in making his diagnosis of pedophilic disorder. And he testified that Turner's ongoing sexual fantasies of minors, often 12 years old, were also relevant to that diagnosis. Turner argues that this evidence were insufficient to lead to the pedophilic disorder diagnosis. He notes that, while he abused six year old S.H., that occurred over a decade prior to trial. And, although Turner had sex with 13 year old S.P., Turner contends that Dr. Judd's testimony acknowledged that S.P. was pubescent when Turner was attracted to her.

Dr. Judd clearly identified why the acts against S.H. and S.P. nevertheless supported his diagnosis of pedophilic disorder. Dr. Judd testified that Turner was between the ages of 15 and 17 or 16 and 18 when Turner abused S.H. S.H. also indicated that the abuse occurred until Turner moved out of his parents' house at age 18. There was an approximately eight year age gap between Turner and S.H. Turner engaged in sexual activity with S.H. for a period of greater than 6 months, was over 16 when the abuse occurred, and S.H. was under 13 and over 5 years younger than Turner. For these reasons, Dr. Judd testified that Turner's acts against S.H. fit the criteria for a pedophilic disorder diagnosis.

Turner does not argue that the abuse of S.H. did not occur when he was over 16. Rather, he argues that it should not be sufficient to meet the requirement because it occurred many years earlier, and does not suggest present dangerousness.[2] But, Turner cites no authority suggesting that the pedophilic acts supporting the diagnosis must have occurred in the recent past. The diagnostic criteria also does not set forth any such requirement. Nor did Turner's expert Dr. Spizman testify that any such requirement exists. And, even if the lapse of time since the abuse of S.H. was relevant to the weight of the evidence, Dr. Judd testified that Turner's recent masturbatory fantasies, including his acts with S.H. and masturbating to erotic stories involving 8 and 9 year olds, made the acts against S.H. more significant.

Turner correctly points out that Dr. Judd acknowledged that Turner's sexual partners and victims other than S.H. were postpubescent, and therefore not indicative of pedophilic disorder. On cross-examination, Dr. Judd testified that Turner's contact with S.P. is evidence of pedophilic disorder only if she was prepubescent. He acknowledged that S.P. had begun menstruating, and testified that S.P. was "at some level of pubescence." Turner asserts that this contradicts and undermines a conclusion that his interactions with S.P. indicate pedophilia.

But, with respect to S.P., Dr. Judd testified that menstruation does not necessarily take a child out of the prepubescent category for diagnostic purposes. Rather, the child's physical characteristics, such as breasts and pubic

---

[2] "Mental abnormality" is tied directly to present dangerousness. In re Det. of Henrickson, 140 Wn.2d 686, 692, 2 P.3d 473 (2000).

hair, are most significant. And, Dr. Judd noted earlier that the fact that S.P. had some breast development at the time of Turner's physical attraction to her does not necessarily take her out of the prepubescent category. On this point, he testified as follows:

Q. Even if [S.P.] is on the line, so to speak, with regard to being another hands-on victim for the actual diagnosis part of the pedophilic disorder, is what occurred with her still relevant to your diagnosis?

A. It is.

Q. How so?

A. Just from the fact that this is [an ]individual that is at some level of pubescence or growth and that he is continuing to focus on individuals such as this.

Although isolated portions of Dr. Judd's testimony may have appeared contradictory, he made the relevant facts and his conclusion clear:

Again, as I said in my prior testimony, not only do we have these individuals between ages of 6 and . . . age 13, but we also have the consistent reports throughout the records of him having fantasies and enacting fantasies of school girl/teacher, father/daughter, grandfather/granddaughter. We have reports of him in 2009 masturbating to individuals from age -- down to age 12. We again have the same report in 2012 of the same sort of pattern, that his primary fantasy or most significant is a preteen female and her mother.

So we have these various data points throughout the records which would support a pedophilic diagnosis.

Turner's acts against S.P. were probative of Dr. Judd's diagnosis of pedophilia.

And, Dr. Judd testified that Turner admitted to fantasies of girls as young as 10. He would read erotic stories involving girls as young as 8. Turner's community custody officer read notes she had taken on Turner that stated the

" '[m]ajority of his sexual fantasies are 13-year-old females. He knows it is not okay but can't stop himself. Ultimate fantasy is sex with a preteen girl and her mother while he is in a military group that is not part of the U.S. military.' "

In a sufficiency challenge, this court views the evidence in the light most favorable to the State. Audett, 158 Wn.2d at 727. When viewed in that light, Dr. Judd's testimony satisfied the DSM-5's pedophilic disorder criteria. The apparent inconsistencies in Dr. Judd's testimony were for the jury to weigh in comparing Dr. Judd's credibility against Dr. Spizman's credibility. Broten, 130 Wn. App. at 335 ("We defer to the trier of fact regarding a witness's credibility, conflicting testimony, and the persuasiveness of the evidence."). The jury heard sufficient evidence to support Dr. Judd's pedophilic disorder diagnosis.

B. Recent Overt Act

Turner also argues that evidence was insufficient to show that he committed a "recent overt act." Involuntary civil commitment is a substantial curtailment of individual liberty and therefore requires a showing that the offender is presently dangerous to justify commitment. In re Det. of Lewis, 163 Wn.2d 188, 193-94, 177 P.3d 708 (2008). To satisfy this requirement, the State must prove beyond a reasonable doubt that the offender has committed a "recent overt act." Id. at 194.

" 'Recent overt act' means any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the

history and mental condition of the person engaging in the act or behaviors." RCW 71.09.020(12).

Whether an act is a recent overt act is a mixed question of law and fact. In re Det. of Brown, 154 Wn. App. 116, 121, 225 P.3d 1028 (2010). To resolve questions of mixed law and fact, we apply legal precepts to factual circumstances. Id. Unchallenged factual findings are verities on appeal, and the application of law to those facts is a question of law reviewed de novo. Id.

Our analysis is guided by our Supreme Court's decision in In re Detention of Anderson, 166 Wn.2d 543, 211 P.3d 994 (2009). Anderson had a history of sexually violent crime and was diagnosed with pedophilia. See id. at 547. He was voluntarily committed at Western State Hospital (WSH). Id. at 546-47. There, he had sex with developmentally disabled patients, some of whom were unable to consent. Id. at 547. These victims were not prepubescent. See id. at 550. Anderson sought to leave WSH. Id. at 547. The State filed an SVP petition. Id.

The court held that the acts with the other patients at WSH qualified as a recent overt act based on Anderson's history of similar sexual behavior. Id. at 548. And, expert testimony suggested that Anderson was merely using the developmentally disabled individuals as substitutes for his preferred victims, prepubescent children. Id. The court also cited Anderson's ongoing sexual

fantasies of prepubescent children as relevant to its conclusion that Anderson committed a recent overt act.[3] Id.

The key inquiry is a reasonable person's apprehension of sexually violent harm based on the individual's past. For example, in Broten, this court found that an offender committed a recent overt act when he visited a park playground. 130 Wn. App. at 335-36. The court's conclusion relied on Broten's "mental history, numerous release violations, admission of fantasizing about molesting and raping young girls, and pattern of placing himself in high risk situations in anticipation of causing sexually violent harm." Id.

In re Detention of Albrecht, 129 Wn. App. 243, 118 P.3d 909 (2005) reached a similar conclusion. Albrecht offered a 13 year old boy who was "smaller than other children his age" some change to follow Albrecht, and at one point attempted to grab the boy's hand. Id. at 249-50. The Albrecht court held

---

[3] Moreover, the Anderson expert noted that the lack of available prepubescent children led Anderson to seek out developmentally disabled adults as an alternative. 166 Wn.2d at 550. And, here, Dr. Judd provided testimony that the lack of available prepubescent children was a factor in Turner engaging 15 year old T.A.:

Q. How does the access to kids who were -- access issues to kids younger to 13 factor into your analysis?

A. I think it's a matter that accessing children that are younger than 13 would be more challenging because they are typically -- in the community, they are going to be with parents or they will be with some authority figure as opposed to simply being released into the community, use public transit, or to do other activities independent of that kind of supervision.

Thus, the jury heard evidence that, like Anderson, Turner pursued T.A. in part as a form of substitution, because she was easier to access than prepubescent children.

that this was sufficient evidence to show a recent overt act. Id. at 257. The court relied on the offender's pedophilia diagnosis and history of offering candy or money to small children in order to lure them. Id. Albrecht's act was not explicitly violent or sexual, but rather highly suggestive that it would lead to a violent or sexual act with the boy. See id.

Here, Dr. Judd testified that Turner's acts involving T.A. amounted to a "recent overt act."[4] T.A. was 15. Turner was 28. Turner knew she was a high school freshman. Turner introduced himself to T.A. while she was on her way to school. They rode the bus together. He began texting her. His CCO saw Turner "immersed" in composing a message to T.A. that stated "Roses are red like a sweet, tender kiss engulfs the soul and fuels the heart. There is only one word for this: DESIRE." He texted her that he wanted to buy her lunch. He told her he wanted to give her a massage. He had saved her bus schedule on his phone. And, the conduct towards T.A. aligned closely with Turner's prior conduct, such as when he met a 14 year old on a bus and eventually kissed her in a park. Dr. Judd testified that, based on his observation of Turner, he believed that Turner would have pursued T.A. even if she was as young as 12. Turner's conduct towards T.A. could create a reasonable apprehension of sexually violent harm when considering Turner's history and mental condition.

---

[4] Turner cites no authority to suggest that the recent overt act must be an act that itself would support a diagnosis of the alleged mental abnormality. Rather, the text of statute states that the act must cause a reasonable apprehension of sexually violent harm. RCW 71.09.020(12). Thus, the fact that T.A. was 15 is not dispositive on the recent overt act issue.

Turner cites In re Detention of Davis, 109 Wn. App. 734, 745, 37 P.3d 325 (2002), in arguing that proof of a community custody violation is insufficient to prove a recent overt act. The Davis trial court determined that, in the SVP proceeding, the State need not prove that Davis committed a recent overt act because he was incarcerated for a community custody violation. Id. at 737. On appeal, this court held that, while the State need not prove a recent overt act if the individual is incarcerated for a sexually violent offense conviction, it must prove a recent overt act if the individual is incarcerated for a community custody violation.[5] Id. at 745-46, 748. This is because the community custody violation required only a preponderance standard, whereas the SVP elements must be proven beyond a reasonable doubt. Id. Thus, the Davis jury never heard any arguments or evidence on whether Davis committed a recent overt act. See id. at 737-38. The State put forth no evidence on the recent overt act elements besides its original statement of probable cause, because the trial court originally held that it was not required to. Id. at 747.

But, the record on Turner's appeal is different. The State did not argue that the community custody violations were per se sufficient to show a recent overt act. Rather, it presented the jury with evidence of multiple contacts with minors, fantasies, role play, and expert opinion on the significance of these actions in light of the diagnosis.

---

[5] Washington law does not require the State to prove a recent overt act if the offender is incarcerated when the SVP petition is filed. Davis, 109 Wn. App. at 739.

15

Dr. Judd's opinion, based on the evidence taken in the context of Turner's past sexual behavior and reported fantasies, was that a person with full knowledge of Turner's history would have a reasonable apprehension of harm of a sexually violent nature. The evidence was sufficient to support the finding that Turner committed a recent overt act.

C. Likely to Reoffend

Turner next contends that the evidence was insufficient to show that he was more likely than not to reoffend. Turner makes two arguments on this point. First, he argues that the actuarial tools were flawed and therefore insufficient. Second, he argues that Dr. Judd's clinical judgment was insufficient, because his clinical judgment is less reliable than the actuarial tools themselves.

To prove this element, the State is required to show that the person more probably than not will engage in predatory acts of sexual violence if released unconditionally from detention. RCW 71.09.020(7). Actuarial tools may be used to prove this element, but experts' opinions are not limited to the results of actuarial tools. In re Det. of Meirhofer, 182 Wn.2d 632, 645, 343 P.3d 731 (2015).

First, Turner contends that the actuarial tools at issue were insufficient to prove this element. He contends this is so, because one actuarial tool, the Static 99-R, put Turner's reoffending risk below 50 percent. And, the actuarial tool that estimated Turner's risk of reoffending above 50 percent, the Violent Risk Appraisal Guide Revised (VRAG-R), included violent recidivism as well as sexual

reoffenses. But, Turner cites no authority suggesting that the expert opinions are confined to the precise results of actuarial tools.

Dr. Judd gave his expert opinion that the VRAG-R was the more reliable of the tools, and it put Turner's risk of reoffending at 76 percent within five years, and 87 percent within 12 years. He acknowledged that the VRAG-R had some shortcomings might overestimate sexual reoffense. But, he nevertheless concluded that Turner's risk of reoffending was higher than 50 percent. Dr. Judd's acknowledgement of the VRAG-R's imperfections is not grounds to reject his conclusions.

Second, Turner argues that Dr. Judd's clinical judgment was insufficient, because, he contends, it was less reliable than an actuarial tool that showed Turner had a low risk of reoffending. Dr. Judd believed that one actuarial tool, the Static 99-R, underestimated Turner's risk of reoffending, while another tool, the VRAG-R, overestimated that risk. Using his own judgment and knowledge of the tools' shortcomings, he concluded that Turner's risk was somewhere between the two, but over 50 percent.

The crux of Turner's argument is that Dr. Judd's deviation from the actuarial results is inherently less reliable than the actuarial results themselves, and therefore insufficient. Our Supreme Court has endorsed the use of actuarial tools in making such determinations. See Meirhofer, 182 Wn.2d at 645. But, it has also rejected insufficiency arguments that expert judgments must bow to actuarial tools. See id. at 645-46. In Mierhofer, the court noted that it has never found that actuarial tools are inherently better evidence than clinical judgment.

17

Id. And, here Dr. Judd testified that, based on both the actuarial tools and Turner's pattern of conduct, his expert judgment was that Turner was more likely than not to reoffend.

The evidence was sufficient to show that Turner was more likely than not to engage in sexually violent acts if released.

We affirm.

WE CONCUR: