IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention of: | No. 82820-7-I |
|---|---|
| E.C. | DIVISION ONE |
| | UNPUBLISHED OPINION |

DíAZ, J. — Skagit County detained appellant (E.C.) for 90 days of more restrictive, inpatient mental health treatment, after a jury found him "gravely disabled" under the Involuntary Treatment Act (ITA), Chapter 71.05 RCW. E.C. argues that the trial court abused its discretion in admitting hearsay evidence, which lacked proper foundation under ER 703 and 705, and whose admission requires reversal of the subsequent commitment order. Even assuming such testimony was improper hearsay, we affirm the order because E.C. does not demonstrate any prejudice from the admission of the allegedly improper opinion testimony.

I.     FACTS

On May 4, 2021, following his arrest for domestic violence and a violation of a no-contact order, a designated crisis responder (DCR) detained E.C., alleging he was "gravely disabled," a term which will be defined below. E.C. was

Citations and pin cites are based on the Westlaw online version of the cited material.

transferred to North Sound Telecare Evaluation and Treatment Center (North Sound), which petitioned to detain him for 14 days, again as gravely disabled. Following a hearing on May 7, a commissioner of the Skagit County Superior Court found E.C. suffered from schizophrenia and was gravely disabled, and ordered him to be involuntarily detained at North Sound for 14 days.

On May 18, North Sound petitioned the superior court to detain E.C. involuntarily for 90 days, again as gravely disabled.

In preparation for trial, E.C. moved in limine to exclude testimony "regarding events outside the personal knowledge of the witness unless the foundation is made that the event is not offered for the truth of the matter asserted and of a type relied upon by experts in that witness's field to form the expert's opinion on the subject." E.C. further moved, in the alternative, for "a limiting instruction as evidence is presented for such testimony based upon ER 602 and ER 703." The State did not oppose the motion and agreed to the language of the proposed limiting instruction; in turn the court granted the motion. The parties and the court's apparent intent was to read the limiting instruction "before [the State's] experts testify as to any foundational evidence." No such instruction was requested or provided during or after trial.

Further, E.C. moved in limine to exclude reference to a "no contact order" entered against E.C. as inadmissible hearsay, which led to his arrest. The court

2

reserved on this issue, explaining that "[n]othing in this ruling prevents the [State] from having their expert witnesses testify as to the basis of their opinions subject to any limiting instruction that may be proffered." The court further explained that "nothing in this ruling prevents the [State] from testifying as to what their understanding is as to [E.C.'s] ability to return home going forward." The court alerted that parties that if they "don't have an admissible no-contact order, then that raises the question as to whether or not they can testify about his no-contact order." There is nothing in the record indicating that any no-contact order was admitted as substantive evidence.

Trial was held on June 14 and 15, 2021. During the trial, two experts testified on behalf of the State, neither of whose expertise E.C. challenged. First, Edward Ebert, a board-certified psychiatric mental health nurse practitioner who worked at North Sound, who had been treating E.C. for six weeks. Ebert was followed by Wendy Robinson, the clinical director at North Sound.

There was no dispute at trial as to the following:

- E.C. suffered from schizophrenia, which involves "psychosis, which is a loss of connection with reality in one or more forms, including sometimes hallucinations, delusions, derailment of thought patterns and other loss track of reality, reality testing." To

that point, E.C.'s delusions had not "improved" much at all since first being detained at North Sound.

- E.C. did not "like" taking his medication, had not been taking his medications all the time, and needed "constant" prompting to take them. To that point, E.C.'s conditions are "worse without medication." Further, the providers were able to determine his baseline prior to his admission to North Sound based on his past medical records, which indicated that he stopped taking his medications entirely a few months prior to admission.

- E.C.'s ability to prepare food for himself was lacking and he needed supports to maintain his physical health. Without such supports, he "would deteriorate." Further, when he was provided such supports, E.C. "successfully stayed in the community" and, when he was not, "he recommitted within a week."

- E.C.'s ability to care for his hygiene was virtually non-existent, having showered twice in the six weeks he was there.

- E.C. displays "agnosia," which is an individual's belief they don't have a mental illness.

- E.C. wanted to live nowhere that would provide such supports for medication and food and would not engage in any type of release planning.

It was in the context of Ebert's testimony regarding housing options that objections were first raised and first largely sustained as to the no-contact order and subsequent arrest (being the reason E.C. could not return to his previous home), and E.C.'s delusions about people living in his previous home. However, Ebert was permitted to testify, over objection, regarding "delusions about where he's able to live and stay and go," including that his former "wife had moved away, and that someone else was living in his former home illegally, and that he should be able to return there, and that he has a no-contact order against the people living in his former home." Finally, the State referred to the no-contact order in his rebuttal closing argument, which E.C. successfully objected to. The court however denied his motion for a mistrial.

After both parties had rested, the court instructed the jury on the law. The court did not include any limiting instruction as to any reference to a no-contact order.

The jury found E.C. had a mental disorder, that he was gravely disabled, and that the interests of E.C. and others would not be served by less restrictive treatment. The court entered an order committing E.C. restrictively for 90 days.

5

E.C. now claims that the "core" of Ebert's "'opinion' testimony was hearsay — assertions that E.C. could not in fact return to his previous home and that E.C. experienced related delusions. Yet the State did not establish that the witness's opinion was based on sources of information that are reasonably relied on in the witness's field of expertise. The trial court therefore erred in admitting hearsay evidence." E.C. argues that the admission of such evidence was prejudicial because "the primary concern was that E.C. would lack shelter if the facility discharged him to something other than more restrictive treatment."

The entirety of the State's response revolves around whether E.C. preserved the exact error of assignment he asserts in his appeal. However, in a footnote, the State asserts that, "[b]y responding by asserting lack of issue preservation, North Sound does not concede any issues on the propriety of the expert opinions or claimed prejudice."[1]

## II.     ANALYSIS

A. Brief Background on ITA

---

[1] The State further provides no response to E.C.'s concerns as to mootness. "Passing treatment of an issue or lack of reasoned argument are insufficient to merit judicial consideration." Joy v. Dep't of Labor & Indus.,170 Wn. App. 614, 629, 285 P.3d 187 (2012) (citing West v. Thurston County,168 Wn. App. 162, 187, 275 P.3d 1200 (2012)). Thus, we will not consider whether this appeal should be dismissed based on mootness.

Under the ITA, "'[g]ravely disabled' means a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24). The jury found E.C. gravely disabled under prong (b).

Prong (b) requires the State to prove that the individual both (i) manifests severe deterioration in routine functioning, as shown by escalating loss of control over thoughts and actions, and (ii) that the individual is not receiving essential care. In re LaBelle, 107 Wn.2d 196, 205, 728 P.2d 138 (1986). The care the patient is anticipated to receive in a restrictive environment care "must be shown to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." Id. at 208. Finally, implicit in the "b" prong of gravely disabled is a requirement that the individual is "unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." Id. at 208.

The State has the burden of proving its case to the trier of fact by clear, cogent and convincing evidence. RCW 71.05.310; LaBelle, 107 Wn.2d at 209.

And the rules of evidence apply at such proceedings. RCW 71.05.310; LaBelle, 107 Wn.2d at 222.

B. Background on the Relevant Evidentiary Rules

"Interpretation of an evidentiary rule is a question of law, which we review de novo." State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007) (citing State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003)). "When the trial court has correctly interpreted the rule, we review the trial court's decision to admit evidence under ER 404(b) for an abuse of discretion." Id. (citation omitted).

"Under ER 703 and 705, expert opinions can be admitted "without foundation except for testimony establishing the expert's qualifications."" State v. Sanders, 66 Wn. App. 380, 385, 832 P.2d 1326 (1992) (citations omitted). Under Rule 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

ER 703.

Under Rule 705:

> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

ER 705.

Under ER 801(c), ""Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c).

"An evidentiary error which is not of constitutional magnitude, such as erroneous admission of ER 404(b) evidence, requires reversal only if the error, within reasonable probability, materially affected the outcome." State v. Stenson, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997); State v. Acosta, 123 Wn. App. 424, 438, 98 P.3d 503 (2004). The proper foundation for expert testimony is not an error of constitutional magnitude which can be raised for the first time on appeal. State v. Sanders, 66 Wn. App. 380, 385, 832 P.2d 1326 (1992).

C. Application of Law to Facts

Here, there is no allegation that the trial court's evidentiary ruling(s) rise to the level of constitutional magnitude. Therefore, this court assesses whether the error was harmless by measuring the admissible evidence against the prejudice caused by the inadmissible testimony, assuming the error was preserved. Acosta, 123 Wn. App. at 438.

This court, however, need not reach (1) whether the error alleged was preserved through (a) E.C.'s meritorious motions in limine, (b) the objection that was overruled, and/or (c) the denied motion for a mistrial, nor (2) whether the

State's expert's testimony had the proper evidentiary foundation under ERs 703, 705, or 803, because E.C. has made no showing, within reasonable probability, that any such preserved error materially affected the outcome. Stenson, 132 Wn.2d at 709.

As reviewed above, the testimony was unrebutted that E.C., who had ongoing diagnosis of schizophrenia, was not taking his medications consistently; needed prompting to so take them; was not improving at all in terms of his delusions; could not prepare his own food or engage in other types of self-care; wanted to live nowhere where such care was provided; and would not engage in release planning. The testimony was further unrebutted that, without such supports, he "would deteriorate" and had worse outcomes since leaving his less restrictive housing in January (as the baseline), in terms of medication and other health needs. He deteriorated so much "he recommitted within a week" of discharge. Finally, it was unrebutted that E.C. displays "agnosia," which makes him "unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [his] need for treatment." LaBelle, 107 Wn.2d at 208.

Moreover, it is simply not true that the State's "primary concern was that E.C. would lack shelter if the facility discharged him to something other than more restrictive treatment" or that E.C.'s lack of housing was "a central focus" of the

State's claim. Even if the court had entirely set aside any reference to any of his housing options, the State painted a very clear picture of an individual who both (i) manifests severe deterioration in routine functioning (such as medication, food, hygiene), as shown by escalating loss of control over thoughts and actions (using his January state as a baseline), and (ii) would not receive essential care, outside of a restrictive environment, all of which was shown by more than clear, cogent and convincing evidence. LaBelle, 107 Wn.2d at 205. Finally, his medication, food, and hygiene challenges are obviously "essential to" his "health or safety" and "the evidence [] indicate[s] the harmful consequences likely to follow if involuntary treatment is not ordered." Id. at 208.

As such, when viewed in the totality of the State's experts' testimony, E.C. has not shown that, within reasonable probability, any such error admitting testimony regarding his housing situation materially affected the outcome. Stenson, 132 Wn.2d at 709. In turn, there is no prejudice.

### III. CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Mann, J.

Mxon, J.